**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Winston Valdemar SPRINGER,
Defendant-Appellant.**

**No. 71–1188.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 9, 1971.

Decided May 25, 1972.

Robert R. Tepper, E. St. Louis, Ill., for defendant-appellant.

Henry A. Schwarz, U. S. Atty., Jeffrey F. Arbetman, Asst. U. S. Atty., E. St. Louis, Ill., for plaintiff-appellee.

Before CUMMINGS, PELL and STE-VENS, Circuit Judges.

PELL, Circuit Judge.

Springer appeals from convictions on four counts of an indictment charging him with violations of 18 U.S.C. § 2113(a), (c), (d) and § 371 (conspiracy) arising out of an armed robbery of a federally insured savings and loan institution on May 5, 1970, in East St. Louis, Illinois. There was substantial evidence showing his participation in the crime; however, a reversal is sought based upon claimed violations of his constitutional rights in pretrial interrogations and upon claimed trial errors.

Trial testimony placed Springer as a sharing participant in the division of the bank loot immediately following the robbery. Three witnesses to the occurrence identified Springer as one of the robbers although two of them apparently needed their recollections refreshed by

photographs taken during the holdup. The photographs themselves were in evidence as were two incriminating confessions by Springer, one oral and one in writing.

The admissibility of the two confessions, properly challenged by a motion to suppress, is the principal basis of Springer's appeal.

Upon learning, on May 16, 1970, from his sister that a warrant for his arrest had been issued, Springer approached two city detectives, telling them that he "wanted to go downtown to get it straight." Approximately three hours later he was interviewed by two FBI agents and during the course of this interview he gave the oral confession.

One of the agents on the following day wrote a statement based on the oral confession. On May 18, Springer was arraigned and counsel was appointed for him at his request. Shortly thereafter, while still in the marshal's office, the FBI agent talked to Springer who signed the written confession transcribed the previous day. No additional facts apparently were elicited on this occasion.

On the occasion of the first FBI interview, the "Your Rights" form used by that agency was read aloud to Springer who also himself read a copy thereof.[1] Springer then signed a waiver of rights form, following which the interrogation occurred which resulted in the oral confession. The record is silent as to any persuasive basis for belief that Springer was mentally incapable of comprehending what he was doing, that he was overreached or under duress, or that he was speaking or acting other than voluntarily, unless some of the surrounding circumstances establish a legal vitiation of voluntariness.[2]

On the May 18 occasion, the "Rights" form was handed to Springer who appeared to read it and who thereafter signed a waiver of rights form.

Further reference to the factual context will be made as necessary to set forth Springer's contentions.

He first argues that the May 16 oral confession cannot be considered voluntary because it was induced by promises. Both FBI agents denied any promises had been made to Springer, and, indeed, he testified himself, ". . . I couldn't exactly say a promise. . . ."

■ The claim here stems from an inarguably correct proposition of law that a confession must not be extracted by implied promises, however slight, Bram v. United States, 168 U.S. 532, 542–543, 18 S.Ct. 183, 42 L.Ed. 568 (1897). *See also* Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The implied promise here is not clear. Springer's testimony on several occasions is that if he would cooperate the agent could "almost assure" him. He is silent, however, as to what he was being

1. "These procedures and warnings employed by the FBI were cited with approval by the Supreme Court in *Miranda*, 384 U.S. 436 at 483–484; 86 S.Ct. 1602, 16 L.Ed.2d 694. They have been approved by our court in United States v. Johnson, 7 Cir., 426 F.2d 1112, 1115 (1970), and United States v. Cook, 7 Cir., 432 F.2d 1093, 1106 (1970), cert. denied, 401 U.S. 996, 91 S.Ct. 1224, 28 L.Ed.2d 535 (1971)." United States v. Comiskey, 460 F.2d 1293 (7th Cir. 1972).

2. We discount completely, as apparently did the judge and jury, Springer's trial testimony in this respect. He stated, *inter alia*, that he had been removed to a dark, secluded room segregated from the rest of the detective bureau and had there been questioned and "cohered" while in a state of shock and emotional and mental disturbance. Springer's counsel on this appeal has quite properly chosen not to advance this incredible theory. Thus in Springer's brief filed in this appeal it is stated as follows:

"Defendant does not contend that he was beaten into his confession. He does not contend that he was psychologically tricked into his confession. He does not contend that he did not know what he was doing at the time of his confession. His confession was, in the normal sense of the word, voluntary."

assured. We know of no requirement in the examination of the voluntariness of a confession that an implication be erected on pure conjecture.

The FBI agent who had been the principal interrogator, when asked about "cooperation" being involved, stated that Springer was informed "that if he were to cooperate, no promises of any kind would be made to him; however, the United States Attorney would know of the fact that he had cooperated, and the Court would also be aware of the fact that he had cooperated."

That this was the gist of the colloquy on this point seems clear from Springer's own testimony at the hearing on the motion to supress.

"Q. I see. In other words, what did he promise you?

"A. It wasn't a direct promise. It was law or something to make a direct promise. 'I can't promise you, but I will amost [sic] assure you.'

"Q. Of what?

"A. Of what?

"Q. What did he assure you about?

"A. 'That the prosecution and the judge and Mrs. [sic] Elvira Fellner [U. S. Commissioner] will know.'"

While what Springer claims was impliedly promised was, and on this appeal is, not demonstrated we may infer from a trial tactic that it could have been some sort of lesser punishment for his crime. This, although admittedly conjectural, could be read from Springer's testimony concerning his arraignment before the United States Commissioner:

"Mrs. [sic] Fellner distinctly said, 'Mr. Benson called me and told you cooperated; therefore, I will go light on you. I will set your bond at twenty-five thousand dollars.' This marshal was present."

While a $25,000.00 bond for a man who had signed an indigency form would seem either to belie the going "light" or to demonstrate a somewhat macabre

sense of humor, we do not have to guess. Miss Fellner, the Commissioner, and the deputy United States marshal denied the statement and Miss Fellner further denied that the FBI agent had called her and recommended anything. The testimony was that if there had been a recommendation as to the amount of the bond, which it did not appear there had been in this case, it would have come from the United States Attorney. For rather obvious reasons, this tack was not pursued on appeal.

The thrust of the trial strategy was that the confession was involuntarily induced. Indeed, Springer's counsel, notwithstanding the lack of a reference to Springer's confession in the opening statement of the United States attorney, put the matter of the confession squarely before the jury in his own opening statement. The district court, following a fairly conducted pretrial hearing on the motion to suppress, found the claim of involuntary confession to be without merit. The jury reached the same conclusion and we do also.

As was stated in United States v. Frazier, 434 F.2d 994, 995–996 (5th Cir. 1970), "Frazier's confession was not involuntary by reason of the single fact that the FBI agents told him that if he cooperated with them his cooperation would be made known to the United States Attorney, that there might be some consideration by the United States Attorney but that the agents could make no promises."

No public policy should castigate a confession of crime merely because it may have been prompted by the hope that cooperation might achieve or increase the chances of a lenient sentence. United States v. Drummond, 354 F.2d 132, 144, 149 (2d Cir. En Banc 1965), cert. denied, 384 U.S. 1013, 86 S.Ct. 1968, 16 L.Ed.2d 1031 (1966).

Springer's second contention is that the May 16 confession was not secured in a manner to satisfy the "heavy burden" laid on the Government by Miranda

v. Arizona, 384 U.S. 436, 475, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[3]

On the occasion of the first interview with the FBI, Springer admittedly being in custody, following a display of credentials, one of the agents advised Springer that he was being interviewed with regard to the robbery. A copy of the "Rights" form was handed him and then read to him as follows:

"Before we ask you any questions you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning. If you cannot afford a lawyer one will be appointed for you before any questioning, if you wish. If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer."

Beneath the rights statement appeared the following waiver:

"I have read the statement of my rights, and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me, and no pressure or coercion of any kind has been used against me."

Springer signed this waiver as he also did on May 18.

Springer here is distinguishing the issue from the first voluntariness issue, emphasizing the claimed lack of knowledgeable waiver of his rights under the fifth and sixth amendments, rather than the broader concept of voluntariness referred to in *Bram, supra.*

■ The crux of the complaint is that the agent conducted no "real inquiry into defendant's waiver." While the *Miranda*-dictated forms may be so mechanistically or slightingly used as to destroy their efficacy for their intended purpose, we are not of the opinion that a law enforcement agent has to engage in a violent argument with an in-custody subject to a point beyond that reasonably necessary to assure effective communication.[4] After that reading, Springer was asked "if he understood it, and he said he did." Also as previously noted herein, Springer's reply brief asserts that he is not contending "that he did not know what he was doing at the time of the confession."

■ Although the evidentiary pretrial hearing on the motion to suppress was not cursory, nor did it appear Springer was limited in his presentation, the record is sparse on those factors "including the background, experience, and conduct of the accused," Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), which a court usually considers in deciding whether or not a waiver of constitutional rights was knowledgeably made. Why neither side presented this information which would have been available to both is only a matter of speculation. Suffice it to say that the district court determined that the confessions were admissible, thereby finding that the waivers were proper. This type of finding is entitled to substantial deference and we will not overturn it if it is substantially supported. Byrd v. Lane, 398 F.2d 750, 752 (7th Cir. 1968), cert. denied, 393 U. S. 1020, 89 S.Ct. 625, 21 L.Ed.2d 564

3. The contention here made would seem also applicable, if valid, to the May 18 written confession, as generally the same procedure was followed with the exception that the "Rights" statement was not read aloud to Springer.

4. "Indeed, there can be no sound public policy requiring law enforcement and prosecutory agencies affirmatively to prevent or deter individuals from confessing that they have engaged in unlawful conduct." United States v. Drummond, 354 F.2d 132, 144 (2d Cir. En Banc 1965), cert. denied, 384 U.S. 1013, 86 S.Ct. 1968, 16 L.Ed.2d 1031 (1966).

(1969) (a case considering this issue in the setting of the voluntariness of a consent to search, the fourth amendment equivalent issue), and United States v. Thompson, 356 F.2d 216, 220 (2d Cir. 1965), cert. denied, 384 U.S. 964, 86 S. Ct. 1591, 16 L.Ed.2d 675 (1966) (also a search case where the court emphasized the importance of the district judge's "judgment of the credibility of the witnesses").

Other courts have reached the same conclusion that the reading of the form to the accused and giving him a chance to read it himself, followed by his statement that he understands his rights and his signature on the form, is sufficient to satisfy the *Miranda* test. United States v. Montos, 421 F.2d 215, 224 (5th Cir. 1970) cert. denied, 397 U.S. 1022, 90 S.Ct. 1262, 25 L.Ed.2d 532; United States v. LeQuire, 424 F.2d 341, 343 (5th Cir. 1970); Bailey v. United States, 410 F.2d 1209, 1213 (10th Cir. 1969), cert. denied sub nom., Freeman v. United States, 396 U.S. 933, 90 S.Ct. 276, 24 L.Ed.2d 232 (although there the record did show the defendant had previously consulted an attorney); Pettyjohn v. United States, 136 U.S.App.D.C. 69, 419 F.2d 651 (1969), cert. denied, 397 U.S. 1058, 90 S.Ct. 1383, 25 L.Ed.2d 676 (1970) (a case of a volunteered statement by the defendant rather than one arising from custodial interrogation).

While cases may be conceived where the Government might have the duty to present evidence of a defendant's mental ability so as to show that he could understand what he was doing, we do not find that such procedure was required in the present factual setting.

■ Rather, what we hold is that the facts as presented by the Government in this case (the signed waiver form and the undisputed testimony that the form had been read to and by the defendant and that he said he understood) is sufficient to raise a presumption of validity and shift the burden of going forward to the accused who must present some

facts tending to show that the waiver was not voluntary or knowledgeable. This Springer has failed to do. As Judge Wisdom stated in United States v. Trabucco, 424 F.2d 1311 (5th Cir. 1970), cert. dismissed per Rule 60, 399 U.S. 918, 90 S.Ct. 2224, 26 L.Ed.2d 785, a case involving a Chilean seaman who received his *Miranda* warnings in Spanish and stated he did not wish to have an attorney present:

> "... where a *Miranda* warning had been given and the record revealed without contradiction that each defendant 'affirmatively acknowledged an understanding of the warnings given him', there was no burden on the Government to go further and prove that the accused fully understood the warning. ... There is no evidence that Trabucco lacked sufficient understanding of his rights to be able intelligently to exercise them." 424 F.2d at 1317.

As an alternative to the above analysis, Springer would have us delve further into his May 16th waiver on the basis of our decision in United States v. Nielsen, 392 F.2d 849 (7th Cir. 1968), where a defendant, after stating that he refused to waive his rights, immediately went ahead and answered certain questions. We said that such conduct

> "... should have alerted the agents that he was assuming seemingly contradictory positions with respect to his submission to interrogation. ... [T]he agents should have inquired further of him before continuing the questioning. ..." 392 F. 2d at 853.

From this language Springer asserts that any "non-self-explanatory waiver" ought to be suspect and require the agents to "inquire further" as in *Nielsen*. We do not find that such a ruling is required by *Nielsen* nor do we choose to extend that decision to such a position.

■ In *Nielsen*, the witness had assumed a clearly self-contradictory posture, first saying he refused to answer

any questions and then, without further ado, indicating that he had changed his mind, starting to answer those questions. In the present case, it was only after answering some questions that Springer admitted his part in the robbery. Thus, at the time he waived his right to remain silent, there was nothing so self-contradictory in his behavior as to make further inquiry necessary. Rather his conduct, as far as the agents could tell, was completely logical. Springer was a man who had been accused of a robbery and had turned himself in to explain things or get them straightened out. That was just what he was doing when he waived his rights: he was explaining to the police who had been searching for him how he was *not* involved in the crime. Thus, we find that at the time of signing the Waiver of Rights form, there was nothing self-contradictory in Springer's actions that might compel us to place a burden of further inquiry on the FBI agents.

Springer's most significant contention is with regard to his written confession of May 18, 1970, which was secured while he was in custody following his preliminary arraignment before the United States Commissioner at which time counsel had been appointed for him.

Springer first asserts that once the Government has knowledge that an accused has counsel it must notify such counsel before it can conduct any further interviews with his client. Second, even if such notice is not required, it is argued that the burden of proving a knowing waiver of the right to the presence of counsel is higher and that the proof surrounding the May 18th interview fails to show such waiver as required by *Miranda*.

 Springer would first have us affirm as a principle that Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and subsequent cases have made it clear that law enforcement officials cannot procure a statement of any kind from a defendant who has an attorney without at least prior notice to, if not the consent of, the attorney. Although such a rule might seem to follow from a reading of *Massiah* alone, wherein the Court spoke in very broad terms in dicta, we are constrained by precedent both of this court and the Supreme Court to reject this line which admittedly has the value of simplicity in administration, as do all *per se* rules. That a constitutional right, such as the right to counsel, may be waived is not questioned. Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). Thus, in United States v. Fellabaum, 408 F.2d 220 (7th Cir. 1969), cert. denied, 396 U.S. 858, 90 S. Ct. 125, 24 L.Ed.2d 109, and United States v. Crisp, 435 F.2d 354 (7th Cir. 1970), cert. denied, 402 U.S. 947, 91 S. Ct. 1640, 29 L.Ed.2d 116 (1971),[5] this court has affirmed convictions resulting from confessions obtained without the presence of counsel. However, these precedents are not dispositive of the present issue, except insofar as they establish there is no *per se* rule for which Springer has argued. In both *Fellabaum* and *Crisp*, the suspect was the one who initiated the conversation, and in *Fellabaum* he repeatedly stated he did not want his attorney present.

Even though there is no *per se* rule, Springer argues that an even higher *Miranda* burden is put on the Government, after retention of counsel, to show an effective, valid and knowing waiver of counsel. In principle, because of the importance of both fifth and sixth amendment rights, the Government's case in the particular situation before us must be a clear one to prevent the exclusionary rule from becoming operative.

The general question has been several times considered by appellate courts, but, at least insofar as resolving this case, we find in them considerable exposition without substantial direct illumi-

5. *See also* Reinke v. United States, 405 F.2d 228 (9th Cir. 1968).

nation. This is because of the necessity of resting the ultimate authority of any decision on the factual situation engendering it.

Thus, no one could quarrel with the result in a case such as Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L. Ed.2d 1265 (1959), which involved an all night inquisition in a prosecutor's office, a police station, and an automobile during which the defendant repeatedly asked to be allowed to send for his lawyer, which request was repeatedly denied.

We turn then to the factual situation upon which we must rest our determination of whether Springer did effectively waive his fifth and sixth amendment rights.

Upon doing so, we find the following factors of persuasive significance in the total tableau of events:

(a) The interview was conducted in an atmosphere totally devoid of any bastinado aspects. There was no real indication of any mental or physical pressure which could be responsible for an overbearing of the will.

(b) The district court held a full evidentiary hearing, listened to the witnesses, including the FBI agent and Springer, had an opportunity to evaluate their credibility, and found the confession properly obtained.

(c) On May 16, 1970, Springer read, and had read to him, a correct statement of his rights of counsel and to remain mute, and stated he understood them. On May 18, 1970, he was advised similarly of his rights by the United States Commissioner. Subsequently on the same day when the written statement in question was signed, Springer was again handed a statement of his *Miranda* rights.

(d) On both May 16 and 18, he freely and voluntarily signed a waiver of those rights. There is no indication he did not understand what he was doing.

(e) The written confession was not prepared at the time of the May 18 interview but had been transcribed the previous day by the FBI agent on the basis of the oral confession, properly and previously given. There was no question and answer session. The FBI agent testified he asked no other questions. Springer was merely given an opportunity to confirm or change his voluntary statement of two days earlier.

(f) The district court instructed the jury on voluntariness of confessions. The jury heard Springer testify as to the circumstances under which the confession was given but found him guilty.

(g) There is no clear indication in the record that the FBI agent knew that counsel had been appointed for Springer at the time of the May 18 interview.[6] During the trial Springer filed a second motion to suppress the confession in which it was alleged that the agent "knew, should have known or with minimal diligence, could have known that said defendant had appointed counsel prior to presenting the said confession to defendant for defendant's signature." However, the record does not even show that it was known to the agent that Springer had been before the United States Commissioner. In the rights form given to Springer on the 18th was the admonition that if "you cannot afford a lawyer, one will be appointed for you before any questioning, if you wish."

(h) It would appear that Springer was not concerned about his representation by counsel on the 18th. While it is true that the Commissioner testified that Springer asked to have counsel appointed, the defendant's own testimony, in response to whether he had been told by the Commissioner that he had a right to an attorney, was

6. Cf. United States v. Smith, 379 F.2d 628, 633 (7th Cir. 1967), cert. denied, 389 U.S. 993, 88 S.Ct. 491, 19 L.Ed.2d 486; United States v. Crisp, 435 F.2d 354, 357, 359 (7th Cir. 1970), cert. denied, 402 U.S. 947, 91 S.Ct. 1640, 29 L.Ed.2d 116.

"No, she said she was goint to appoint me an attorney, asked me did I have one. I said, 'No.' She said, 'Well, I'm going to appoint one.' "

(i) Springer's self-determined decision not to conceal his guilt but to cooperate with regard to the apprehension of other participants in the robbery is reflected in a letter voluntarily written by him to the United States Commissioner two days after the May 18 statement was signed which reads in part as follows:

"Talking to Special Agent Benson I realize how wrong I was, but I not as bad as this may make me seem. . . I would like to make a request . . . . for a recognizance bond so I may help locate the man who is really responsible for this whole thing. I have a clean record until this incident occurred. My mother has agreed to pay all the money back that was taken. . . . I told Mr. Benson that I was very likely to find the man who is responsible if I had a chance."

At this time also, Springer obviously was charting his own affairs and not seeking guidance, or assistance, from counsel.

(j) Although the appointed counsel and the FBI agent disagreed as to whether the attorney had authorized a June interview with Springer, the agent did go to see Springer in jail and testified as follows:

"At that time I talked to Springer and told him that I was interested in discussing with him the identity of the third man in the bank robbery and the whereabouts of Michael Dillard. I questioned him, 'Have you talked to your attorney?' He said, 'Yes.' He said, 'I have talked to my attorney, and my attorney has told me to talk to no one.' I immediately ceased the interview and told him that, 'I will see you in the future after you have discussed this with your attorney.' There was no further interview."

The agent then promptly went to the attorney's office and reported the incident.

The record convinces us that at least until June, Springer was embarked on a plan through which, it is not unreasonable to assume, he hoped to achieve judicial leniency[7] for this, his first crime, and that if counsel, which he had not sought, had any place in the picture, it was to further his main purpose of leniency in view of his obvious guilt.

Later, of course, this idea was radically changed and at trial Springer denied any participation in the armed robbery. In fact, he denied making most of the statements to the agent which appeared in the written confession. He did, perhaps from a slip of the tongue, testify that he had said that he was the last one to go in the savings and loan building.

On the basis of the particular factual situation before us, and we go no farther than that, we are of the opinion that the confession of May 18 was properly received into evidence.

■■■■ One factor in reaching this decision is that the district judge held an extensive evidentiary hearing on the motions to suppress the two confessions. In similar cases from the fourth amendment area, this court has held that "whether a consent to search is voluntary is a question for the trier of facts and its finding, if substantially supported, will not be disturbed on review." Byrd v. Lane, 398 F.2d 750, 752 (7th Cir. 1968), cert. denied, 393 U.S. 1020, 89 S.Ct. 625, 21 L.Ed.2d 564 (1969). Also, United States v. Thompson, 356 F. 2d 216, 220 (2d Cir. 1965), cert. denied, 384 U.S. 964, 86 S.Ct. 1591, 16 L.Ed.2d 675 (1966). We are not prepared to say that the evidence was not enough to give "substantial support" to the decision. We do this, even though we recognize that there is a higher standard imposed to show waiver of the presence of counsel once counsel has been appointed than before, since the factors presented to the

7. *See* United States v. Drummond, *supra*, 354 F.2d at 149.

trial judge do support an inference of knowledgeable waiver.

The statement of rights on May 18 was not as thoroughly brought to Springer's attention as on the 16th; however, it went farther than has been required in some cases.

Thus the Illinois Supreme Court in People v. Hill, 39 Ill.2d 125, 233 N.E.2d 367 (1968), cert. denied, 392 U.S. 936, 88 S.Ct. 2305, 20 L.Ed.2d 1394, stated:

> "It should be made clear that once *Miranda's* mandate was complied with at the threshold of the questioning it was not necessary to repeat the warnings at the beginning of each successive interview. To adopt an automatic second-warning system would be to add a perfunctory ritual to police procedures rather than providing the meaningful set of procedural safeguards envisioned by *Miranda.*" 233 N.E.2d at 371.

This same result was reached when the second interrogation was three days after the first in Maguire v. United States, 396 F.2d 327 (9th Cir. 1968), cert. denied, 393 U.S. 1099, 89 S.Ct. 897, 21 L. Ed.2d 792 (1969).

■ Nor should the fact that the 18th warning was only in writing be too significant a consideration. In a well-reasoned opinion by District Judge Jameson it was stated: "Ordinarily it is not essential that the agent advise an accused of his rights orally. Where the accused reads and understands the written advice, that is sufficient. The critical question is whether the defendant here fully understood the warning and voluntarily, knowingly, and intelligently waived her rights." United States v. Bird, 293 F.Supp. 1265, 1274 (D.Mont. 1968). In sum, even if there had been no warning given prior to the May 18th confession-signing, there is precedent to uphold the confession and certainly the fact that the warnings given were only by a written form cannot be dispositive.

While the factors cited above make up the *ratio decidendi* for our holding the confession admissible, we feel that they are only symptomatic of a record which, when carefully read, shows that Springer was indeed sufficiently intelligent knowingly to have waived his constitutional rights in this case. Nonetheless, we do agree with the majority in Coughlan v. United States, 391 F.2d 371 (9th Cir. 1968), cert. denied, 393 U.S. 870, 89 S.Ct. 159, 21 L.Ed.2d 139, which in reaching a result similar to ours, stated:

> "We, on the other hand, do not want to be considered as lending our approval to the practice, if indeed a practice exists, of interviewing accused persons in jail in the absence of counsel. The better, fairer, and safer practice is to afford the defendant's attorney reasonable opportunity to be present. When this is done the heavy burden of proving a waiver of constitutionally protected rights is immeasurably eased." 391 F.2d at 372.

We further note the emphasis in Judge Kiley's opinion in United States v. Smith, 379 F.2d 628, 633 (7th Cir. 1967), cert. denied, 389 U.S. 993, 88 S. Ct. 491, 19 L.Ed.2d 486, on knowledge of the appointment of counsel:

> "We have held that the *Miranda* rule does not reach Smith's conviction. However, we are of the opinion that in post-*Miranda* cases the *Miranda* rule applies with *greater* force to preclude as unconstitutional the admission of statements resulting from in-custody interrogation *after known retainer or appointment of counsel* and without counsel's presence or approval, unless it very clearly appears that the accused deliberately and understandingly chose to forego the assistance of counsel at such interrogation." (Emphasis in original.)

■ Springer also attacks the May 18th interview as being in violation of DR 7–104(a) (1) of the Illinois Code of Professional Responsibility (the successor to Canon 9 of the ABA Canons of Ethics). The Rule states in pertinent parts:

> " . . . a lawyer shall not: (1) Communicate or cause another to com-

municate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so."

We feel that the Code should be applied to both civil and criminal cases. However, this application is part of our supervisory authority. In United States v. Smith, *supra*, in a situation remarkably similar to the present case, it was said:

"Judicial enforcement of compliance with the Canons of Ethics, however, is a matter of supervisory power rather than a requirement of constitutional dimensions. Here Smith's statement was clearly voluntary in fact, and constitutional doctrine prior to *Miranda* required no more. We see no reason on this record, in view of the overwhelming evidence of his guilt, to use our supervisory power to reverse his conviction." 379 F.2d at 633.

Mr. Justice White in dissenting in Massiah v. United States, *supra*, similarly disposed of the contention as follows:

"This case cannot be analogized to the American Bar Association's rule forbidding an attorney to talk to the opposing party litigant outside the presence of his counsel. Aside from the fact that the Association's canons are not of constitutional dimensions, the specific canon argued is inapposite because it deals with the conduct of lawyers and not with the conduct of investigators." 377 U.S. at 210–211, 84 S.Ct. 1199 at 1205.

We *do not decide* that the *proper case* may not invoke the exercise of our supervisory power. The present case does not.

■ Springer's other contentions are easier of disposition. As to the alleged violation of the opinion rule in allowing the eyewitnesses to use the hidden camera's photographs of Springer to refresh their memories at trial and as to the alleged prejudicial nature of the Government's opening and closing statements, while we find no particular merit in these matters, we need only note that no proper objections were preserved at the trial. There being no aspect of "plain error," we deem the contentions to have been waived, United States v. Gulley, 404 F.2d 534, 536 (7th Cir. 1968).

■ Springer also quarrels with the trial judge's remarks to the jury when Springer's co-defendant was dismissed by motion of the Government. There is a statement in the record by Springer's trial counsel in a conference in chambers preceding the dismissal that "it certainly sounds prejudicial." However, when the dismissal actually occurred, some time later, and the judge committed his allegedly prejudicial error by failing to give any cautionary instruction, Springer's counsel made no objection. Such a failure to object at the proper time is equivalent to a waiver of the objection. Further, there is no indication that counsel requested a cautionary instruction.

The conviction appealed from is, therefore,

Affirmed.

STEVENS, Circuit Judge (dissenting).

After counsel had been appointed to represent him, and while he was in custody, the defendant was visited by two agents of the prosecutor.[1] Defense counsel was not present and received no advance notice of their proposed visit. The sole purpose of the visit was to obtain evidence for use at the trial. Accepting the prosecutor's evidence as true, defendant's participation in the crime had already been established and, therefore, no further investigation was necessary. The work of the agents was trial preparation, pure and simple.

---

[1]. They cannot disclaim knowledge of the fact that a lawyer had been appointed to represent the defendant. See Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) ; Santobello v. New York, 404 U.S. 257, 262, 92 S.Ct. 495, 30 L.Ed.2d 427.

In a civil context I would consider this behavior unethical and unfair.[2] In a criminal context I regard it as such a departure from "procedural regularity" as to violate the due process clause of the Fifth Amendment.[3] If the evidence of guilt is as strong as the prosecutor contends, such direct communication is all the more offensive because it was unnecessary. If there is doubt about defendant's guilt, it should not be overcome by a procedure such as this.

I respectfully dissent.

2. Cf. Trans-Cold Express, Inc. v. Arrow Motor Transit, Inc., 440 F.2d 1216, 1219 (7th Cir. 1971); see ABA Code of Professional Responsibility, § DR7–104(A)(1); see also In Re Schwabe, 242 Or. 169, 408 P.2d 922 (Or.1965).

3. The fact that the agents had defendant sign a standard waiver of rights form on May 18 *after* counsel had been appointed provides affirmative evidence that he did not fully grasp the significance of the procedural situation in which he found himself. That form recited that a lawyer "*will be appointed* for you . . . if you wish." (Emphasis added.) There is certainly less basis for believing that this defendant understood the nature of the constitutional protection he was waiving than the defendant in United States v. Smith, 440 F.2d 521 (7th Cir. 1971), see dissenting opinion at 529, 530, 535.; or that he had any better grasp of the significance of the information imparted to him by the prosecutor's agents than did the defendant in United States ex rel. Raymond v. People, 455 F.2d 62, 66–67 (7th Cir. 1971), see separate opinions at 72–73 and 74–75.