On a trial under a two-count indictment charging appellant with murder in the first degree of Warren Green by allegedly shooting him with a pistol in one count and with a gun in the other count, a jury found him guilty of murder in the second degree and fixed his punishment at imprisonment for twenty-five years. He was sentenced accordingly.
There was abundant evidence of the corpus delicti of the crime charged, which included testimony that about 11:45 A.M. on December 1, 1977, Mr. Green and his wife were found in a store they operated in Mount Vernon tied back to back with an extension cord. Both had been shot in the head and were lying in or near a pool of blood. They were both alive at the time they were found, but Mr. Green soon died before being removed from the store. Mrs. Green was sent to a hospital. The spent bullet of a .38 pistol was found near them on the floor, and one bullet was found in Mr. Green's brain. He had been badly beaten. A robbery had unquestionably occurred. A toxicologist testified that Mr. Green's death was caused by gunshot to his head.
Deputy Sheriff Ronald Emrich testified that he arrested defendant on July 28, 1978, in the Hogan Park area of Prichard, Alabama, after he had seen him "break and run" as he approached with another officer in a police automobile. Officer Emrich identified him before he ran, as a suspect in the case.
The evidence connecting defendant with the alleged crime consisted partly of an incriminating statement made by him to officers while he was in jail on September 14, 1978. In his statement, defendant said, inter alia, that he, Freddie Lee Wright, Percy Craig and Roger McQueen had gone to the store in Craig's automobile and were at or in the store when the robbery and killing occurred; two shots were fired, both by Wright; all four left together in the same automobile, went to the house of a sister of Craig and divided the loot; defendant's part was about "$300.00." A correct resolution of two of appellant's contentions for a reversal turns on whether defendant's incriminating statement was admissible in evidence over defendant's objection.
Appellant's insistence that the incriminating statement of defendant was not properly admitted in evidence is based on the contention, as it was on the trial, that at the time he made the statement he had an attorney but that the attorney was not present when the statement was made and defendant was thereby deprived of his right "to have the assistance of counsel for his defense," guaranteed to him by the Sixth Amendment to the Constitution of the United States, as held in Massiah v. UnitedStates, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) and subsequent cases. *Page 1071 
Appellant does not ground his contention to any extent upon any claim of a violation of his Fifth Amendment rights. He does not contend that his statement was not voluntary or that it was made inadmissible by reason of the presence or the absence of antecedent or concurrent conditions that would vitiate the statement in accordance with principles set forth or foreshadowed in Miranda v. Arizona, 384 U.S. 436,86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
The evidence is not as clear, convincing and undisputed as we would like for it to be as to whether defendant had an attorney at the time of the statement. Some of the uncertainty and confusion on the question is probably because of the fact that when the trial occurred and when the testimony was taken on the question of the admissibility of the statement, two indictments had been returned against defendant for the unlawful killing of Mr. Green, one indictment on September 14, 1978, and the other on April 20, 1979. The first indictment charged an offense under the Death Penalty and Life Imprisonment Without Parole Chapter of Code of Alabama 1975, § 13-11-2, which was nol prossed on July 13, 1979. The transcript of the proceedings and the "Case Action Summary" of the record show that he was arraigned, entered a plea of not guilty, and was represented by Attorney Chris Galanos on September 22, 1978. The "Bench Notes" of the Case Action Summary show also that on October 2, 1978, "Mr. Donald Brutkiewicz states he does not represent the defendant. Case re-set for October 27, for an attorney," and that a notice of appearance was filed by Attorney Donald Brutkiewicz on October 16, 1978. Other entries in the Bench Notes indicate inconsistencies therewith, that defendant was represented by Attorney Galanos, and the only entry during 1978 indicating that he was represented by Mr. Brutkiewicz is the one stating that a notice of appearance was entered by said attorney on October 16, 1978. There are four entries therein in 1979, three of them showing that he was represented by Attorney Brutkiewicz. The fourth entry is on May 28, 1979, and merely states, "Case passed — Defendant has escaped." The last entry is on July 13, 1979, and states, "On motion of District Attorney, Chris Galanos; It is ordered and adjudged by the court that this case be and the same is hereby Nolle Prossed — defendant's attorney, Donald Brutkiewicz, in court." It should be stated that Mr. Galanos had not become a district attorney at any of the times the record indicates he was representing the defendant.
Defendant was arraigned in the instant case, the case under the second indictment, on July 13, 1979, on which date and thereafter the record shows clearly that he was represented by Mr. Brutkiewicz. His trial was commenced on November 26, 1979, with Mr. Galanos, then District Attorney appearing as counsel for the State, and Mr. Brutkiewicz, Sr., and Mr. Brutkiewicz, Jr., appearing for defendant. Before any action whatever was taken, it was made clear by colloquy among the court, District Attorney Galanos and Attorney Brutkiewicz, Senior, that, although Mr. Galanos had appeared in the early stages of the other case as appointed attorney for defendant and had filed some motions and a demurrer therein, he had "never had any face to face contact or any contact, direct or indirect, with Mr. Tinsley other than seeing him in the courtroom at the time he was arraigned." Mr. Galanos asked if there was any objection to his "representing the State as a prosecutor in this State." It was then made clear by Mr. Brutkiewicz and the defendant that neither had any such objection.
It developed, during the proceeding out of the presence of the jury as to the question of the admissibility of defendant's incriminating statement, that there had been a preliminary hearing on the first case and that Mr. Brutkiewicz appeared for defendant as his attorney at that hearing. The officer who testified for the State as to the incriminating statement and as to the predicate therefor to meet the constitutional requirements as to voluntariness, instructions and warnings as to his constitutional rights, particularly his right not to be caused to incriminate himself and his right *Page 1072 
to an attorney at the expense of the prosecution, testified that he knew that Mr. Brutkiewicz represented defendant on the preliminary hearing. However, it appears that the officer did not understand that Mr. Brutkiewicz was representing him at the time the incriminating statement was given. He said that he had no recollection of any conversation with or about Mr. Brutkiewicz in connection with his taking the statement of defendant. A part of his testimony was as follows:
 "Q. And reflecting your recollection of events, do you remember calling my office and calling to my secretary?
 "A. I remember calling your office, trying to get in touch with you and telling you what your client had done or something to that effect, let you know what had happened.
"Q. My name came up?
 "A. No, sir. I knew you from the preliminary hearing, Mr. Brutkiewicz. I don't know who represented him at this time.
 "Q. You don't know but this defendant told you that I represented him, did he not?
 "A. No, sir, he didn't know who represented him. He didn't know if he had a lawyer at the time.
 "Q. You don't know positively that he told you that before any statements are made that Brutkiewicz must be present?
 "A. No, sir, he did not say that. Matter of fact, he said he did not want an attorney."
Before the trial court finally ruled on the question of the admissibility of the incriminating statement, the defendant and Mr. Brutkiewicz testified out of the presence of the jury. Defendant testified to the effect that one or both of the officers to whom his statement was given threatened him by saying that he would see to it that he was sent to the electric chair unless he made a statement and that he asked for them to get Mr. Brutkiewicz, who represented him, that he wished to talk with him before he made any statement. Mr. Brutkiewicz testified to the effect that he was employed by defendant's family to represent him at the preliminary hearing. The following is a part of his testimony:
 "The defendant was bound over to the Grand Jury and during the period of time between the preliminary trial and his indictment his family kept in contact with me. Some times as often as two or three times a week his sister would call me and some of his relatives from out in the Prichard area would call me. When I discovered that Tinsley had been indicted by the Mobile County Grand Jury his sister and I had discussed the question of my representation of Tinsley in the Circuit Court. She advised me at that time that she definitely wanted me to represent him; that they were having difficulty in getting up an attorney's fee; that her mother was in Philadelphia — who would be the mother of the defendant — and they were making arrangements for the mother to come down and talk to me and that she assured me that they wanted me to represent him.
 "I advised them that I couldn't appear in Court as his counsel until some time that an attorney's fee arrangement could be made. I think they understood that. The arraignment came up. I didn't appear. After arraignment I received a letter from Mr. Galanos advising me that he had appeared by appointment as Tinsley's attorney and advised me that he had filed some pleadings. Some time after that, some time after Mr. Galanos had written me a letter informing me that he had been present and about — I would say about the 27th day of September, 1978, I returned to my office around 3:30 or 4:00, probably from District Court, which is located in the Courthouse in the same area as the Mobile County Jail, I saw a note on my sticker that Mr. Tillman [one of the officers who took defendant's statement] had phoned me about Tinsley. I phoned the Mobile County C.I.D. and Mr. Tillman had gone. Nobody was around. Driggers [the other officer participating in the taking of defendant's statement] wasn't there. Nobody was *Page 1073 
there. The only person that answered the phone was someone who was not a detective.
 "After the 27th of September Tinsley's mother came down from Philadelphia and she and I entered into a contractual relationship where I would represent Tinsley. And I thereafter filed an appearance in this case. And I have represented him during a portion of the time that the old indictment was before this Court and when the new indictment was brought against him I represented him on arraignment and have represented him ever since."
On cross-examination, Mr. Brutkiewicz testified:
 "Q. Is it your testimony, sir, that you were not his attorney on September 27, 19 . . .
 "A. I wasn't his attorney of record. Now, he may have easily considered me as his attorney, as the family may have considered because they were continually calling me. Even during that period of time. As I mentioned to you, I told his sister that until such time as we had a firm understanding as to my fee that I could not appear at arraignment. But they constantly called me and I don't recall his having called me from the jail, but they constantly wanted me to go see him. They were constantly concerned about his case, as they have always been ever since I have originally come in contact with them. The family has always considered me their attorney.
 "Q. During this period from your representation in District Court until the date that you stated that you couldn't appear without a fee — and what was that date, to the best of your recollection?
 "A. I don't know. My memory could be refreshed. If you would show me the docket sheet . . .
 "Q. You filed an appearance, according to the Court record, on October 16?
 "A. Somewhere immediately preceding that date. Because that's when his mother came to see me from Philadelphia.
 "Q. Now, the Court record reflects that on September 2nd, '78 `Mr. Donald Brutkiewicz states he does not represent the defendant.' Did you make that representation?
"A. I am sure I did, yes.
"Q. Do you know to whom you told it?
 "A. I am sure I must have told the Court because I don't represent anybody until such time as my fee arrangement is made. And I did not represent him. Now, the family very likely considered me his attorney and the family was very likely confident they were going to come up with my fee."
In the extended argument and lengthy colloquy among the court and counsel for the respective parties as to the admissibility in evidence of defendant's incriminating statement, several authorities were cited and discussed. Among them are Thomas v.State, Ala.Cr.App., 373 So.2d 1149, aff'd 373 So.2d 1167 andThompson v. State, Ala.Cr.App., 347 So.2d 1371, 1376, in which it is stated:
 "Contrary to the argument presented by the appellant, the fact that a defendant has an attorney does not mean, as a per se rule, that law enforcement officials cannot procure a statement of any kind from the defendant without prior notice to, if not the consent of, the attorney. Massiah v. United States, 337 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) does not compel the contrary conclusion to this rule. United States v. Springer, 460 F.2d 1344, 1350 (7th Cir. 1972). The right to counsel is a constitutional right and may be waived. Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977
(1964). Neither does Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) require us to reach the conclusion maintained by the appellant. United States v. Smith, 379 F.2d 628, 638 (7th Cir. 1967), cert. denied, 389 U.S. 993, 88 S.Ct. 491, 19 L.Ed.2d 486; Springer, supra, at 1353. Thus the Supreme Court has affirmed convictions resulting from confessions obtained without *Page 1074 
the presence of counsel. United States v. Fellabaum, 408 F.2d 220 (7th Cir. 1969), cert. denied, 396 U.S. 858, 90 S.Ct. 125, 24 L.Ed.2d 109, and United States v. Crisp, 435 F.2d 354 (7th Cir. 1970), cert. denied, 402 U.S. 947, 91 S.Ct. 1640, 29 L.Ed.2d 116 (1971), cited in Springer, supra, at 1350."
During the lengthy colloquy among the court and counsel for the respective parties, defendant's attorney endeavored to distinguish instant case from cases holding that there is no per se rule of inadmissibility of a custodial, incriminating statement of an accused who has an attorney that is made in the absence of the attorney and without his consent, by insisting that such is not a correct principle of law in a case, such as the instant case, in which an indictment had been returned prior to the time the statement was made. Neither party cites an authority that is conclusive on that point. We find it unnecessary to attempt to decide it at this time, for the reason that the record and the evidence show with reasonable certainty that the attorney who is asserted to have been defendant's attorney was not in fact his attorney at the time of the statement. There is some uncertainty as to what was meant by some of the evidence on the question, such as some evidence to the effect that one of the officers taking the statement called said attorney as to the taking of the statement, but there is no positive testimony, other than from the defendant, which, if believed, makes it reasonably certain that such call was made on or about the time the statement was made. Furthermore, if there were such an effort by the officer to contact such attorney on or about the time the statement was made, such effort could readily be explained on the basis that the officer understood that said attorney had represented defendant on his preliminary hearing and desired to be assured by said attorney whether he continued to represent the defendant at the time. The record shows that he did not; the testimony of said attorney shows that though he had represented the defendant on the preliminary hearing and was considering whether he would represent him in the circuit court, he was not representing him at the time this statement was made.
We do not ignore the testimony of the defendant on the subject. We can understand that he thought he was represented at the time by the lawyer who had represented him on the preliminary hearing, but he was mistaken. Not only is the testimony of said attorney to the contrary, but the Bench Notes are also. We contrast what he testified on the subject to what the Bench Notes show. He testified:
 "Q. And is it again your testimony that five days before Mr. Brutkiewicz had stood up in Court with you when you were arraigned?
"A. Say what?
 "Q. All right. If you were arraigned on a charge of murder on September 22nd . . .
"A. Uh-huh.
 "Q. . . . And this statement was given on September 27th, five days had passed; is that correct?
"A. Yes, sir.
 "Q. And you told me just a while ago that when you were arraigned on the charge of murder that Mr. Brutkiewicz was your lawyer; that he stood up with you in court?
"A. Right.
"Q. Is that still your statement?
"A. Yeah."
Such testimony is irreconcilable with the Bench Notes showing that he was represented on arraignment by a different attorney, not an employed attorney but an attorney appointed by the court.
Appellant's contention with reference to the admission in evidence of the statement carries with it no suggestion that the attorney appointed by the court to represent defendant on the arraignment should have been present at the time of the statement, or that he should have been notified thereof so that he could determine whether to give his consent for the defendant to make the statement out of the attorney's presence. Whatever can be said for or against it, such contention is not before us for consideration. We should note, however, that there *Page 1075 
is little, if anything, to be found in the law to the effect that when an attorney has been appointed by the court to represent an indigent defendant on arraignment in order for him to be protected as to his constitutional rights at that critical stage of the proceeding, such attorney is obligated, in measuring up to his responsibility under the appointment, to then see to it, in the absence of circumstances requiring it, that the accused is thereafter exclusively his client and that law enforcement personnel be notified accordingly.
There is one statement in the testimony of the officer who participated in taking the statement of defendant that on its face tends to connote involuntariness of the statement. According to his testimony, after he had read to defendant a plenary statement of his rights and a document for the accused to sign acknowledging his understanding thereof and his voluntariness in making the statement, all before the accused made the statement, the witness said, "And I made him sign it." As the word "made" as the past tense of "make," often, and perhaps usually, signifies an element of compulsion, it should be stated that the entire testimony of the witness definitely and positively refutes any such signification in his use of the word. There is no contention to the contrary.
We think also that an additional observation should be made as to defendant's statement, as to its uniqueness in its having been made while the accused was under an indictment for a violation of the Death Penalty and Life Imprisonment Without Parole Act of Alabama, which was subsequently nol-prossed, and the trial was on another indictment, one for murder in the first degree. In the testimony of the defendant on the question of the admissibility of the statement, defendant said that one of the officers had told him in effect that he would see to it that defendant was electrocuted unless defendant told the officers what occurred relative to the incident at Mount Vernon. This was denied by the officer. Nevertheless, there is hardly room for belief that defendant did not fully understand at that time that he was in grave danger of a conviction that would result in a sentence to death and that he should avail himself of any reasonable opportunity to prevent such eventuality. There is good reason to conclude, from all the testimony on the subject and from all the circumstances, that in the mind of defendant uninfluenced in the least by anything that he had learned from officers, he should try to get them to listen to him so that he could explain his conduct so as not to constitute a violation of such statute. He did just so. Insofar as the crime with which he was then charged was concerned, his statement was largely exculpatory. There can be little doubt that his statement as to all the facts that occurred was a major factor in influencing the State to reindict him for a non-capital crime and nol pross the previous indictment. Not only did defendant waive all the rights he had under the Fifth and Sixth Amendments to the Constitution when he made the statement, he profited, in his own mind, by making the statement, and in the course of time the State was caused to abandon its prosecution of him for the greater offense and proceed against him for the lesser. Irrespective, however, of this special consideration, we conclude that the trial court was not in error in admitting defendant's statement in evidence.
The evidence connecting defendant with the alleged crime consisted largely of the testimony of Roger McQueen, who had been previously convicted of murder in the second degree of Mr. Green and had been sentenced to imprisonment for a term of twenty years. He stated in the first part of his testimony that, "the other two charges pending on me of robbery and also a murder" stemming "from the Mount Vernon killings" will be dropped against "me." According to his further testimony, he, Tinsley, Wright and Craig were on their way in Craig's automobile to Jackson, Alabama, to commit a robbery; Tinsley had a .38 revolver, which Tinsley passed to Wright in the automobile and took an "antique sawed off shotgun" that was owned by McQueen, placed the gun under a coat that he obtained *Page 1076 
and wore before getting to Mount Vernon. Upon arrival at Mount Vernon, McQueen went into the store operated by Mr. Green, the Western Auto Store, to buy some masking tape to cover a hole that was in a seat of the automobile. At the time there were only two people in the store, "a lady and also a man." He learned that they had the tape but had to return to the automobile to obtain enough money to buy it. His testimony continued:
 "A. I told Craig they did have the tape but then I didn't have enough money.
 "Q. Did either Tinsley or Wright or Craig say anything else to you?
 "A. Yes, sir, they did. Tinsley asked me how it looked inside and Wright asked me how many people was inside of the store.
"Q. And what was your response?
 "A. I just said it was just two peoples inside of the store.
"Q. Then what happened?
 "A. I entered back into the store to buy the masking tape. At this particular time Wright entered the store.
 "Q. When Wright entered the store do you know if he had a weapon of any kind?
"A. Yes, sir. He had the same .38.
 "Q. All right. And by `same .38,' that's the one that's in evidence?
"A. Yes, sir.
"Q. After Wright came in did anybody follow him in?
 "A. Well, after Wright started assisting Tinsley entered the store.
"Q. Did you notice whether or not Tinsley was armed?
"A. Yes, sir, he was.
"Q. What did he have?
 "A. He had the antique sawed off hid, you know, up under his coat."
McQueen further testified that Wright "was giving orders;" he told the man and the lady "to go in the little side room," which they did. Wright told McQueen to get the money from the cash register, which he did. Wright and Tinsley then "tied the peoples up inside of the store." McQueen went to the automobile with the money he had taken from the register. Both Tinsley and Wright brought some articles from the store to the automobile and while they were putting them in the automobile Craig asked Wright whether "the people had been taken care of." Then Wright and Tinsley went back into the store and upon returning they reentered the automobile. All of them then left in the automobile. McQueen further testified:
 "Q. Was there any conversation in the car pertaining to what happened in the store?
 "A. Yes, sir. I asked Wright what had happened. He said he shot both peoples. Tinsley agreed and I asked him to show me, you know, the empty cartridge from the gun if he had shot both peoples and he opened up the revolver. He showed me both empty cartridges and also he passed them to me. I threw them out the window on 43."
McQueen testified that the four men then went to the house of a relative of Craig and divided the money four ways, in even shares. The witness said he did not participate "with the murder but I participated with the robbery."
A third contention of appellant stated in Proposition II of his brief is as follows:
 "The trial court erred in charging the jury that it was within the trial jury's province to make a determination of fact as to whether witness McQueen was an accomplice."
Both parties apparently are in agreement that the importance of this particular issue between them is to be found in the language of Code of Alabama 1975, § 12-21-222:
 "A conviction of felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and such corroborative evidence, if it merely shows commission of the offense or the circumstances thereof, is not sufficient."
Neither party contends that the testimony of McQueen was not corroborated. Both *Page 1077 
parties apparently recognize that an incriminating statement of a defendant, such as the incriminating statement of defendant in the instant case, "is sufficient corroboration of an accomplice's testimony to sustain a conviction of the accused." Gamble, McElroy's Alabama Evidence, § 300.01 (9) (1977). In first raising the question as to the sufficiency of the evidence to sustain a conviction counsel for defendant stated in moving to exclude the evidence at the conclusion of the testimony for the State:
 "Without the confession all you have is the uncorroborated testimony of an accomplice. There has been no other evidence introduced and should the Appellate Court throw out the confession then I think this case should be reversed and rendered."
Immediately after the court's denial of defendant's motion to exclude, defendant rested and there was no further evidence in the case. Thereupon there was a colloquy, out of the presence of the jury, among the court and counsel for the respective parties as to whether the evidence showed, as a matter of law as distinguished from a question of fact for the jury to decide, whether McQueen was an accomplice to the murder of Mr. Green. Defendant's counsel contended that as a matter of law he was; State's counsel contended that defendant was not. However, no written charge was requested by either party on the subject. In its oral charge to the jury, the court gave lengthy instructions, consisting of more than two transcript pages, on § 12-21-222, with particular reference to witness McQueen, without charging that he was or was not an accomplice, leaving that question as one of fact for a determination by the jury. In addition, the court read to the jury three written charges pertaining to the testimony of Roger McQueen, which are as follows:
 "3. The Court charges the jury that if they believe from the evidence that Roger McQueen was an accomplice to the crime being charged to the defendant the jury must consider the fact that Roger McQueen has been promised rewards for his testimony and therefore the jury should consider his testimony to be suspect.
 "4. The Court charges the jury that if they believe from the evidence that Roger McQueen was an accomplice to the crime for which the defendant is being charged, then they must consider Roger McQueen's testimony to be suspect.
 "5. The Court charges the jury that if they believe from the evidence that Roger McQueen has been offered rewards to testify against Reginald Tinsley then the jury must[1] consider the fact that Roger McQueen may have sworn falsely against Reginald Tinsley in order to save himself from prosecution by the State of Alabama."
Promptly thereafter, the court welcomed exceptions to the court's oral charge out of the presence of the jury, if defendant's attorney preferred it, which he apparently did and expressed an exception, out of the presence of the jury, as shown in the following portion of the transcript:
 "THE COURT: All right. Now, Mr. Brutkiewicz, there is a lot in this case. Let's take it in order. What is your first exception?
 "MR. BRUTKIEWICZ, SR.: My first exception is those portions of Your Honor's oral charge wherein you informed the jury that within their province to make a finding of fact as to whether or not Roger McQueen was an accomplice and the reason I make that exception, Judge, it's the contention of the defendant that because of the facts presented in this case wherein it was undisputed that Roger McQueen was indicted and convicted of this offense which he is testifying against his companion and he has confessed to being involved in the robbery that was involved in this same offense, whether or not he was an accomplice is a question of *Page 1078 
law that is within the province of the jury to make that determination.
"THE COURT: Do you agree with that, Mr. Galanos?
 "MR. GALANOS: No, sir, based on what you read from the Jack's case which quotes the Yarber v. State, Alabama Supreme Court decision it would seem that — well, it doesn't seem — it is the law of this State that where a witness denies his participation in the crime charged against the defendant the issue of his being an accomplice is a disputed fact presenting a question for the jury, despite the additional fact that the witness has previously been convicted for the identical crime.
"THE COURT: Court notes the exception to that.
 "MR. BRUTKIEWICZ, SR.: Judge, when I say the last part, it's within the province of the Court to make that determination. I think I said jury instead of Court. In other words, the basis of my exception is it's within the province of the Court in this particular case because it's a question of law, not a question of fact.
"THE COURT: So noted."
Notwithstanding any question as to the sufficiency of the defendant's exception, it is clear that in stating the reason for the exception, the exceptor was not on sound legal grounds. The fact that a witness for the State has been convicted for the same crime as the one for which a defendant is being tried does not require the conclusion that he is an accomplice to the crime, as shown by the case cited by counsel for the State, and other cases. Yarber v. State, Ala.Cr.App.., 368 So.2d 868
(1978); Jacks v. State, Ala.Cr.App., 364 So.2d 397 (1978). Furthermore, the fact that the witness had "confessed to being involved in the robbery that was involved in this same offense," does not require the conclusion as a matter of law that he was an accomplice to the killing of Mr. Green, unless the robbery that occurred is so involved in the murder as to make applicable the felony-murder doctrine prescribed in Code of Alabama 1975, § 13-1-70, which provides in pertinent part:
 "Every homicide . . . committed in the perpetration of, or the attempt to perpetrate, any . . . robbery . . . is murder in the first degree. . . ."
Whether Roger McQueen was convicted of the murder of Mr. Green under the felony-murder doctrine cannot be decided in this case as the evidence in that case was doubtless not the same as in the instant case. To determine in this case whether he was subject to conviction under the felony-murder doctrine, we can look to the evidence in this case only. From some of the testimony of McQueen as stated above, it is to be seen that a serious question is indicated as to whether at the time Mr. Green was killed, McQueen was still aiding or abetting Wright, who killed Mr. Green, in the commission of robbery or, on the other hand, whether the robbery had been consummated to the extent that the homicide was not "committed in the perpetration" of the robbery, which is required for a conviction of murder under the felony-murder doctrine as prescribed by Code § 13-1-70. Much can be said with reason, pro and con, on the question whether McQueen was properly triable for at least two crimes, robbery and murder of Mr. Green, The resolution of the question would depend to a great extent upon the motive for the killing (whether to insure the success of the robbery or to preclude identification of the robbers), the relation in point of time and the distance between McQueen and Wright and Mr. Green at the time Mr. Green was killed, and other circumstances. In this connection, we keep in mind that according to the evidence, McQueen had been indicted for the robbery and for the murder of Mr. Green and that he had been promised by the State that those cases against him would be nol prossed. The evidence also shows that he was represented by an attorney and that his attorney had concurred in that understanding between defendant and the State. We are not favored by the parties with discussion of whether two separate crimes of robbery and murder of Mr. Green were committed and withhold any final opinion on the subject, but it appears from the evidence in the instant case, which *Page 1079 
is before us now and which was before the trial court when it charged the jury, that whether McQueen was an accomplice to the murder of Mr. Green was not a question of law for the court to decide but was a question of fact properly submitted for the determination of the jury. The trial court did not commit error prejudicial to defendant in submitting to the jury the question whether McQueen was an accomplice to the crime charged in the instant case.
The fourth contention for reversal is that the trial court was in error, in the absence of a requested charge by appellant, in charging the jury that it was not to indulge any presumption as to defendant's failure to testify. The contention is directed at the following in the court's oral charge:
 "In this particular case the defendant had elected not to be a witness, which he has the right and the justification to do. The law never puts the burden on any defendant to prove his innocence or to disprove his guilt but that burden remains on the State of Alabama throughout the trial of this case. You are not to indulge any presumption whatsoever from the fact that the defendant has elected not to be a witness in this case."
After defendant's counsel had taken, and the trial court had considered, defendant's exception to the oral charge as to whether McQueen was an accomplice, the following occurred:
 "MR. BRUTKIEWICZ, SR.: All right. Now, Judge, I also take exception to that portion of Your Honor's oral charge wherein you commented on the defendant's election not to be a witness in his own behalf.
 "THE COURT: Oh. I had another lawyer do that, Donald, and later on he came back and told me that he believed that to be the law. I honestly, if I had thought that would have offended you I wouldn't have said it. I wanted to eliminate the doubt that they may go back there and say why didn't he testify.
 "I don't what I can undo now. I will note your exception. If you word up any explanatory charge that you don't think will aggravate the situation I will give it.
"MR. BRUTKIEWICZ, SR.: I will let it go at that.
 "THE COURT: I will note your exception to that. What else?
"MR. BRUTKIEWICZ, SR.: That's all."
Appellant relies upon Smith v. State, Ala.Cr.App.,370 So.2d 312, 315-318 (1979), in which one reason for a reversal was a portion of the court's oral charge with reference to defendant's failure to testify as a witness. In Smith, as here, defendant had not requested any charge on the subject. Extensive consideration was given in Smith, supra, to the danger of error prejudicial to defendant in the trial court's unrequested instructions to a jury on the subject; a caveat was noted as to an instruction in the absence of a request by defendant. We refrained, however, from holding that an instruction on the subject would necessarily constitute prejudicial error. We noted that under the circumstances of the particular case the particular instruction was subject to a reasonable construction by the jury "that no inference unfavorable to the State could be drawn from the failure of the State to have defendant testify as to his guilt or innocence" and that "if defendant had testified, he would have testified against himself." We have no such instruction and no such likely consequence in the instant case. Furthermore, any possible prejudice to defendant could have been removed by an additional instruction, for which defendant was tendered an opportunity and declined. The court's action did not constitute prejudicial error.
Appellant's fifth and final contention is a conditional one. He says in effect that if the court on appeal holds that defendant's "confession" was inadmissible, the judgment of the trial court should be reversed and a judgment here rendered discharging the defendant. As no such hypothesis now exists, there is no occasion for a discussion of the proposition.
We find no error in the record prejudicial to appellant. The judgment of the trial court should be affirmed. *Page 1080 
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the court. The judgment of the trial court is hereby
AFFIRMED.
All the Judges concur.
[1] In this charge and in charges 3 and 4, the must was changed to may, and as so changed the charges were read to the jury.