341 So.2d 355 (1976)
STATE of Louisiana
v.
Joseph COTTON.
No. 58196-A.
Supreme Court of Louisiana.
December 13, 1976.
Rehearing Denied January 21, 1977.
*356 Frank J. Gremillion, Hynes & Gremillion, Baton Rouge, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Ossie Brown, Dist. Atty., Warren J. Hebert, Asst. Dist. Atty., for plaintiff-appellee.
SUMMERS, Justice.
By bill of indictment filed April 17, 1974 Joseph Cotton was charged with the February 22, 1974 armed robbery of Charles David. After trial by jury Cotton was convicted of simple robbery and sentenced to five years at hard labor. One assignment of error is urged by Cotton on this appeal.
Some familiarity with the circumstances of the offense giving rise to this prosecution will facilitate an understanding of the issues presented by the defense. These facts are essentially agreed upon:
About six o'clock on the evening of February 22, 1974 Charles David, Pierre W. Brignac and Arthur C. Brister arrived at Brister's place of business, a used car lot on Scenic Highway in East Baton Rouge Parish. Brister approached a mobile home used by him as an office and, upon observing its condition, called to David and Brignac *357 something to the effect that the place had been ransacked. About this time a tall black man later identified as Paul Smith burst through the door and shot and killed Brister. Immediately thereafter two more men emerged from the trailer and ran off some distance. Smith then robbed David and fled the scene.
Cotton was arrested early on the morning of February 26, 1974 and transported directly to the sheriff's office. Upon his arrival he was advised of his Miranda rights by Detective Sergeant Fluker of the sheriff's department, who had the rights read to Cotton by Sergeant Gerald. Cotton also read the rights form and signed it. Although he would not make a statement at that time, he did deny knowledge of the robbery and killing.
In the late afternoon of the same day Cotton was placed in a lineup held to determine whether he could be identified by David and Brignac, the two surviving victims. Prior to the lineup, the trial judge appointed counsel to represent Cotton at the lineup. This attorney did attend and assisted in the selection of inmates of the jail to stand with Cotton. The Assistant District Attorney who tried this case was also present at the lineup. He was aware that counsel had been appointed to represent Cotton. No one identified Cotton at the lineup.
After the lineup Cotton was interviewed by his appointed counsel in a small room nearby. As the lawyer left he admonished Cotton not to make any statements. He was overheard by Sergeant Robinson of the East Baton Rouge Sheriff's Office who was nearby in the hall. Robinson was in charge of the investigation of the crime for which Cotton had been arrested. When his lawyer departed, Cotton was placed in a large room known as the "drunk tank". Sergeant Robinson then resumed his occupation with other matters.
Sometime shortly thereafter, Ralph Stassi, a detective with the Iberville Parish Sheriff's Office, sought permission from Sergeant Robinson to speak to Cotton in connection with an investigation Stassi was conducting of a burglary in Iberville Parish involving Paul Smith, a matter unrelated to the offense with which Cotton was charged. Stassi's interest was to ascertain the whereabouts of Smith but when Cotton was unable to furnish the information Stassi discontinued the interview.
After a while Cotton told a jail deputy he wanted to speak to Robinson. Because he was occupied with other matters, and realized Cotton had been admonished not to speak to anyone, Robinson at first disregarded the request. When Cotton continued to send word, perhaps three times in all, Robinson finally joined Cotton in a small interview room. There Robinson told him he wouldn't talk to him until he received the Miranda warnings, and waived his rights.
Robinson thereupon carefully explained each of the Miranda warnings contained on a waiver of rights form to Cotton in the presence of Detective Stassi, who had been called into the interview room to witness the conversation. Cotton acknowledged that he understood his rights and signed the waiver form also signed by Robinson and Stassi as witnesses.
When the signing had been accomplished, the first thing Cotton wanted to know was whether he had been picked out of the lineup. Robinson told him "that two people had said they saw him on the lot that day." Then, according to Robinson, who made notes of the interview, Cotton, to make it perfectly clear that he didn't have anything to do with the actual shooting of Brister, outlined the details of the robbery and killing on February 22, referred to briefly in the beginning of this opinion. The interview was of short duration. It consisted mainly of narration by Cotton with occasional questions by Robinson. At no time during the interview did Cotton ask for his attorney or seek permission to call him, nor did he ask to terminate the interview.
As Robinson left the interview room at the end of the interview, he encountered the Assistant District Attorney who was drinking coffee in the hall. Having been assigned to the case, the attorney was there *358 for the purpose of acquainting himself generally with the progress of the investigation. It was the practice of that office for the attorney assigned to the case to keep in touch with the investigation if it involved a capital crime. When he asked Robinson if he had obtained a statement, Robinson replied that he had. With this information the Assistant District Attorney went into the interview room with Robinson's notes, read them to Cotton, and Cotton verified their correctness. At one point in the reading Cotton made a correction in the price of a handgun he had used on February 22 and later sold. Before being returned to the lockup, Cotton was permitted to use a telephone to ask his mother to retrieve the gun he had sold.
At the trial, on motion of the State, the jury was removed and an extended hearing was conducted to obtain a ruling on the admissibility of the exculpatory and inculpatory statement obtained by Robinson from Cotton. At the hearing the facts outlined above were established.
When Cotton took the stand on the predicate, outside the presence of the jury, he acknowledged that the waiver of rights form had been read to him twice on February 26; once shortly after his arrest as soon as he arrived at the Sheriff's Office and again immediately prior to the statement given to Sergeant Robinson. He also admitted that he had signed the waivers on both occasions.
When Cotton had been interrogated by both counsel, the trial judge devoted 45 minutes to a meticulous and indepth interrogation of Cotton to determine whether he understood, and knowingly and intelligently waived, his right to the presence of counsel and the other Miranda rights.
In his ruling the trial judge held that the confession was knowingly and voluntarily made, and, under the totality of the circumstances, Cotton's statement was a free and voluntary act on his part. He said, "I have absolutely no difficulty with the question whether or not Mr. Cotton understood what his rights were, [or] whether or not he knowingly and intelligently waived them."
The judge continued ". . . [H]e knew what he was doing. He initiated it." The trial judge took into consideration that Cotton was a youth with a ninth grade education, finding him to be articulate and intelligent and not overly affected by the presence of police or his incarceration.
The defense contention was that Sergeant Robinson, though not in bad faith, unintentionally tricked Cotton into making a statement by telling him that someone had identified him at the lineup as a person present on the car lot at the time of the offense. The effect of this, according to the defense, was to induce Cotton to make a statement to exculpate himself of the actual shooting and, at the same time, unknowingly inculpate himself as a participant in the robbery and murder.
In considering this contention, the trial judge reasoned that, while ethical considerations may have been involved when Robinson took the statement knowing that Cotton had been admonished by his appointed attorney not to make any statement, ethical considerations, when balanced against the rights of society, should not militate against the admissibility of the statement if all other factors bearing upon the voluntary nature of the confession were present as they were in this case.
While the trial judge observed that the conduct of Sergeant Robinson may be considered reprehensible according to standards of lawyers and judges, he did not find that it was overly reprehensible in the case of the Sergeant and Detective Stassi, especially since all concede that Robinson's statement to Cotton was, in Robinson's opinion, correct and was not made in bad faith. It was the trial judge's understanding that the general tenor of the cases he had studied supported the conclusion that though an accused has counsel, this does not have the effect of hamstringing the police in their search for the facts if the accused wants to talk to them. In the judge's opinion, the accused is not bound by the admonition of his counsel not to talk. He remains free to choose to follow or not follow his counsel's advice.
*359 There are some subtle coercive influences in any statement obtained from an accused, the trial judge observed. Examples are the effects of arrest and incarceration; these are coercive influences which do not invalidate the voluntary nature of a confession. So, too, Sergeant Robinson's mistaken belief that Cotton had been identified at the lineup may have misled Cotton. But Robinson's statement was not made in bad faith or to mislead Cotton. There was no design to trick.
No confession shall be used against any person accused of crime unless freely and voluntarily made, La.Const. art. I, § 11 (1921); and it must not be made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. La.Rev.Stat. 15:451. There must be no treatment designed by effect on body or mind to compel a confession of crime. La.Rev.Stat. 15:452. But a confession need not be the spontaneous act of the accused and may be obtained by means of questions and answers. La.Rev.Stat. 15:453. The burden is imposed upon the State to establish the free and voluntary nature of the confession. State v. Diles, 316 So.2d 396 (La.1975).
This record undoubtedly supports the finding of the trial judge that Cotton's statement to Robinson was free and voluntary. We do not believe that the fact that a defendant has an attorney means that law enforcement officials cannot procure a statement of any kind from him without prior notice to, if not the consent of, the attorney. United States v. Cobbs, 481 F.2d 196 (3rd Cir. 1973), cert, denied, 414 U.S. 980, 94 S.Ct. 298, 38 L.Ed.2d 224 (1973); United States v. Springer, 460 F.2d 1344, (7th Cir. 1972), cert, denied, 409 U.S. 873, 93 S.Ct. 205, 34 L.Ed.2d 125 (1972). The court in Springer, id., held that a constitutional right such as the right to counsel may be waived, although there is a higher standard imposed to show waiver of the presence of counsel once counsel had been appointed than before.
In Coughlan v. United States, 391 F.2d 371 (9th Cir. 1968), cert, denied, 393 U.S. 870, 89 S.Ct. 159, 21 L.Ed.2d 139 (1968), oral statements were testified to in court by police officers who interviewed the defendant in a jail interview room. The officers knew that the defendant was represented by counsel, but counsel knew nothing of the interview. As is true here, the defendant in Coughlan was fully warned, before he made any statements, of his Miranda rights; but he waived those rights. The court held that the statements made by the defendant were admissible in evidence although it further indicated disapproval, as we do here, of the practice of interviewing prisoners in the absence of their attorneys. This holding was approved in United States v. Cobbs, supra.
In United States v. Cobb, supra, the court stated that it is permissible for a law enforcement official to interview a defendant, even though the defendant has counsel and even though that counsel is not consulted, as long as the proper Miranda warnings are given. The same applies to the case before us. See also Moore v. Wolff, 495 F.2d 35 (8th Cir. 1973). In view of the fact that courts have attached importance to a request by defense counsel to law enforcement officials not to take statements from his client, it is noted here that, even though Sergeant Robinson overheard defense counsel tell Cotton not to make any statements, at no time did defense counsel request that Robinson or others refrain from taking statements from Cotton.
Another issue here is whether the erroneous statement of Robinson that Cotton had been seen at the car lot by two persons destroyed the voluntary character of Cotton's statement.
Justice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained until it is narrowed to a filament. We are to keep the balance true. Snyder v. Massachusetts, 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934).
Just as the law does not require that a defendant receive a perfect trial, only a fair one, it cannot realistically require that policemen investigating serious crimes *360 make no errors whatsoever. The pressures of law enforcement and the vagaries of human nature would make such an expectation unrealistic. Before we penalize police error, therefore, we must consider whether the sanction serves a valid and useful purpose.
Considering the evidence and the finding of the trial judge that Robinson's error did not destroy the voluntary nature of the confession, we agree that the ruling of the trial judge was correct and his evaluation of the evidence should not be disturbed.
For the reasons assigned, the conviction and sentence are affirmed.
TATE, J., dissents and assigns written reasons.
DIXON and CALOGERO, JJ., dissent.
TATE, Justice, dissenting.
I respectfully dissent, although fully recognizing the persuasiveness and sensible comment of the majority opinion. To permit the prosecutor or law enforcement authorities to interrogate a suspect held in jail, without notice to counsel retained or appointed to represent him, marks a real erosion on the constitutional right to effective representation by counsel. It also violates the Louisiana Code of Professional Responsibility and its attempt, in accord with recognized national standards, of ethical regulation in the interest of civilized order: Adverse counsel is prohibited from communicating or causing another to communicate with a client represented by an attorney.
As the majority notes, the assistant district attorney was aware that Attorney Davis was representing defendant; Robinson further knew that the attorney had advised defendant not to make any statements.
In State v. Jackson, 303 So.2d 734 (La.1974), this court held that a confession taken (1) in spite of a request from retained counsel that no further interrogation be made until he had had an opportunity to consult with his client and (2) with the deliberate withholding from the accused of the information that an attorney had called and had stated that he had been retained to represent the accused and did not wish him to be interrogated until he had conferred with him, was inadmissible. In so holding, we stated as follows, 303 So.2d 737:
"Under these circumstances, the interrogation was made without an informed waiver of the defendant's right to the assistance of counsel and to remain silent. When counsel has been retained to represent a prisoner, the governmental authorities cannot deny the lawyer reasonable access to his client, nor may they ignore his request that he be allowed to confer with his client prior to, if not during, the interrogation. Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). See also American Law Institute Model Code of Pre-Arraignment Procedure, Section 140.7 (Tentative Draft No. 6, April 1, 1974). Confessions taken in violation of these principles are constitutionally inadmissible.
"The essential reasons for the constitutional right of access to counsel lie in principles of fundamental fairness safeguarding the rights of an individual against potential governmental abuse, as well as in protecting the integrity of the truth-finding process * * *."
As stated in Miranda v. Arizona, 384 U.S. 436, 465-467, 86 S.Ct. 1602, 1623-1624, 16 L.Ed.2d 694, 718-719 (1966):
"A different phase of the Escobedo decision was significant in its attention to the absence of counsel during the questioning. There, as in the cases today, we sought a protective device to dispel the compelling atmosphere of the interrogation. * * *
"It was in this manner that Escobedo explicated another facet of the pre-trial privilege, noted in many of the Court's prior decisions: the protection of rights at trial. That counsel is present when statements are taken from an individual during interrogation obviously enhances the integrity of the fact-finding processes in court. The presence of an attorney, and the warnings *361 delivered to the individual, enable the defendant under otherwise compelling circumstances to tell his story without fear, effectively, and in a way that eliminates the evils in the interrogation process. Without the protections flowing from adequate warning and the rights of counsel, `all the careful safeguards erected around the giving of testimony, whether by an accused or any other witness, would become empty formalities in a procedure where the most compelling possible evidence of guilt, a confession, would have already been obtained at the unsupervised pleasure of the police.' * * *"
Further, the conduct violated ethical standards of professional responsibility Disciplinary Rule 7-104 of the Louisiana Code of Professional Responsibility provides:
"Communicating With One of Adverse Interest
"(A) During the course of his representation of a client a lawyer shall not:
(1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.
(2) Give advice to a person who is not represented by a lawyer, other than the advice to secure counsel, if the interests of such person are or have a reasonable possibility of being in conflict with the interests of his client."
The American Bar Association Standards of Criminal Justice Relating to the Prosecution Function, Standard 1.1 (1971) provides: "It is the duty of the prosecutor to know and be guided by the standards of professional conduct as defined by codes and canons of the legal profession * * *."
The American Law Institute Model Code of Pre-Arraignment Procedure, Section 140.8(2) (1975) does provide for questioning after representation by counsel, but only under very express and formal waiver of the right to have counsel present at the questioning.
Various federal cases have dealt with issues similar to this case. In Williams v. Brewer, 375 F.Supp. 170, 178 (S.D.Iowa 1974), the federal district court held that "[w]hen police have agreed with the defendant's attorney that defendant will not be questioned in the attorney's absence, when another attorney has asked to be with the defendant at a particular time and place, and when the defendant has repeatedly asserted his desire not to talk in the absence of counsel, the police plainly should not be permitted to interrogate the defendant at all until further notice is given to his counsel."
In United States v. Wedra, 343 F.Supp. 1183, 1186 (S.D.N.Y.1972), the district court stated: "Just as the right to counsel does not depend on a request, so, too, once counsel has been retained and he is known to the interrogators, the right to have him present does not depend upon the accused asserting a formal demand for his presence, at least where, as here, the interrogators have already been advised that the client is not to be questioned in the absence of counsel and they have given assurances to that effect."
And in United States v. Thomas, 474 F.2d 110, 113 (10th Cir.), certiorari denied, 412 U.S. 932, 93 S.Ct. 2758, 37 L.Ed.2d 160 (1973), the court, while affirming the conviction, noted: "What we do hold, however, is that once a criminal defendant has either retained an attorney or had an attorney appointed for him by the court, any statement obtained by interview from such defendant may not be offered in evidence for any purpose unless the accused's attorney was notified of the interview which produced the statement and was given a reasonable opportunity to be present. To hold otherwise, we think would be to overlook conduct which violated both the letter and the spirit of the canons of ethics. This is obviously not something which the defendant alone can waive."
(Contra: United States v. Cobb, 481 F.2d 196 (3d Cir. 1973).)
Accordingly, for the reasons noted, I respectfully dissent. I do agree with the majority *362 that both the police officer and the assistant district attorney were in good faith in interrogating the suspect in the absence of notice to his appointed counsel. However, this court should not countenance even good-faith infringements of constitutional guarantees to the effective representation of an accused by counsel.
The long history of civil liberty in America, and the very reasons for the constitutional guarantees of the bill of rights, indicate that we cannot permit violation of constitutional guarantees even in good faith by officers of government:
What is done in good faith (and most officers of government act in good faith) to assure conviction of the guilty mayeither inadvertently through one-sided zeal or occasionally advertentlycontribute to conviction of the innocent. The jury, not the police nor the prosecutor, determine innocence or guilt; and the right to counsel is an important protection to assure an impartial judgment by the jury on the basis of evidence admitted as reliable as tested by standards derived from our ancient history of safeguarding individuals against intentional or unintentional abuses of the huge powers of government.
I therefore respectfully dissent, feeling that the present opinion of the majority permits an encroachment upon the constitutionally sacred rights of an accused to effective representation by counsel.