356 So.2d 991 (1978)
STATE of Louisiana
v.
Calvin Joseph HEBERT.
No. 60836.
Supreme Court of Louisiana.
March 6, 1978.
Rehearing Denied April 10, 1978.
*992 Risley C. Triche, Napoleonville, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Knowles M. Tucker, Dist. Atty., George W. McHugh, Jr., Asst. Dist. Atty., for plaintiff-appellee.
SANDERS, Chief Justice.
A grand jury indicted the defendant, Calvin Joseph Hebert, for the second degree murder of his wife, Loula Lewis Hebert, a violation of LSA-R.S. 14:30.1. A jury found him guilty of manslaughter. The court sentenced him to nine years' imprisonment.
The defendant appeals. He relies upon five assignments of error for reversal of his conviction and sentence. He specifically abandons Assignments of Error Nos. 5 and 6.
We adduce the following context facts:
The defendant argued with his wife as he undressed for bed. When he took a gun from his belt and moved to place it on the dresser, his wife was shot in the forehead. She died several hours later. The factual issue at the trial was whether the shooting was culpable or accidental.

ASSIGNMENTS OF ERROR NOS. 1, 2, 3, AND 7
The defense contends that the court improperly admitted three inculpatory statements into evidence since the police obtained them in violation of his constitutional right to counsel.
When Officer Wiltz arrived at the defendant's home in response to a radio call, the defendant immediately told him that he shot his wife. To avoid confrontation between the defendant and his wife's family, Officer Wiltz asked him to wait for him at the police station. (Officer Wiltz testified that he had no grounds to arrest him at that time.)
He complied. Once at the station the defendant helped himself to coffee and used the telephone. (Because he was a former part-time officer he was familiar with the station.) He telephoned his attorney, Earl H. Willis, who advised him to remain silent until he arrived the next day.
Police Radio Dispatcher Neveu overheard the defendant say "Willis" on the phone. He knew Willis was an attorney. However, Dispatcher Neveu had no knowledge of the content of the conversation.
Officer Wiltz contacted Dispatcher Neveu and asked him to take a voluntary statement from the defendant. He then asked the defendant if he wanted to give one, and he answered yes. Dispatcher Neveu read the defendant his right to have an attorney present and his privilege to remain silent from the voluntary statement form. The defendant responded that he understood his rights and agreed to give a statement. He did not request the presence of his attorney. At 2:30 a. m., he made a statement which he later recanted. (The State did not introduce this statement.)
*993 When Chief Martin arrived at the police station at 3:30 a. m., he arrested the defendant for attempted murder and discharging a firearm within the corporate limits and advised him of his Miranda rights. Officers Bonvillian, Wiltz, and Dispatcher Neveu were present. When Chief Martin told him that he could have an attorney appointed if he could not afford one, the defendant said that he had already made a telephone call to Mr. Willis, his attorney. Chief Martin then inquired if he wanted him present, and the defendant said not at this particular time. (However, the defendant testified that when he told him that he spoke with Mr. Willis, Chief Martin told him that he could not afford a retained attorney and urged him to make a statement.) The defendant never informed Chief Martin of what Mr. Willis said.
Chief Martin then asked the defendant if he understood his rights and if he wanted to make any statements. The defendant replied that he had just given Dispatcher Neveu a statement. After Chief Martin read this statement, he searched and handcuffed the defendant. He instructed Officer Wiltz to book him.
Later, Chief Martin and Officer Bonvillian interrupted the booking with the news that the defendant's wife had died. After a few minutes, Chief Martin told him that he was now charged with murder, and again read him his Miranda rights. In response, the defendant stated that he understood his rights, wished to waive them, and wanted to change his original story and tell the truth. He then signed a statement of his rights and a waiver thereof which was first read to him. He did not request the presence of his attorney.
At 4:30 a. m., the defendant gave Chief Martin and Officers Wiltz and Bonvillian an oral statement (S-14).[1] In it he admitted holding the gun at chest height and pointing it at his wife. "(M)y finger just pulled the trigger. I didn't want to hurt that woman."
Wishing to get the defendant's statement on paper, Officer Wiltz took a written statement (S-3 and S-3A).[2] He read the defendant his rights (including his right to remain silent and his right to appointed counsel) and a waiver of those rights which were included on the statement form. He stated that he understood what was read. The defendant did not request the advice or presence of counsel. In his statement he explained that with his hand on the trigger and facing his wife, he pulled the trigger. "I didn't know how I did it, I didn't think I had pulled the trigger." Officer Wiltz read the statement back to the defendant and he signed it at 5:30 a. m.
Officer Wiltz re-booked him for murder. When he completed the procedure, he advised the defendant of his right to use the telephone. The defendant replied that he had already phoned his attorney. He did not inform Officer Wiltz of his attorney's advice.
At 10:00 a. m., Chief Martin and Officer Resweber met with the defendant to get a taped statement from him.[3] Again, Chief Martin read the Miranda rights and asked if he understood them. The defendant answered that he did. At this point, the tape is inaudible. However, the defendant later explained that he took the gun out of his belt, held it up, and squeezed the trigger. In addition, he stated that he didn't intend to harm his wife.
The defendant specifically argues that he did not voluntarily, knowingly, or intelligently waive his right to counsel, and that his desire to remain silent until speaking with an attorney was not "scrupulously honored." For support, he points to the following: that he is illiterate; that when Chief Martin first advised him of his rights, Chief Martin told him to give a statement because he could not afford a retained attorney; that he made the oral and written statements immediately after he learned of his wife's death, and thus, while "distraught with emotion"; that there was a lapse in *994 the tape statement following a reading of his rights.
For a confession or inculpatory statement to be admissible, the State must prove that it was made freely and voluntarily, and not made under the influence of fear, duress, intimidation, threats, menaces, inducements, or promises. LSA-R.S. 15:451; State v. Adams, La., 347 So.2d 195 (1977). The trial court's ruling as to the voluntariness of a confession or inculpatory statement will be affirmed on appeal absent palpable error. State v. Ross, La., 343 So.2d 722 (1977); State v. Stewart, La., 325 So.2d 819 (1976); State v. Sims, La., 310 So.2d 587 (1975). In State v. Cotton, La., 341 So.2d 355 (1976), this Court stated:
"We do not believe that the fact that a defendant has an attorney means that law enforcement officials cannot procure a statement of any kind from him without prior notice to, if not the consent of, the attorney. United States v. Cobb, 481 F.2d 196 (3rd Cir. 1973), cert. denied, 414 U.S. 980, 94 S.Ct. 298, 38 L.Ed.2d 224 (1973); United States v. Springer, 460 F.2d 1344, (7th Cir. 1972), cert. denied, 409 U.S. 873, 93 S.Ct. 205, 34 L.Ed.2d 125 (1972)."
The trial judge held the three statements admissible, stating: ". . . taking the totality of everything, . . . the defendant knew of his right to counsel and his right to remain silent, and . . . he voluntarily gave up those rights." (Tr. 392-393) In so ruling, he accepted the testimony of the four officers.
The trial court properly admitted the defendant's statements. The defendant was a part-time officer under Chief Martin for eight months. He admitted knowing that he had the right to remain silent and the right to counsel. Moreover, he was informed of his rights several times within eight hours.
The defendant gave a statement to the officers everytime he was asked with one exception. The first time Chief Martin read him his rights and asked if he wanted to make a statement, the defendant said he had already given one to Dispatcher Neveu. We do not construe this, as the defendant does, as expressing his desire to remain silent until he spoke with an attorney. This is especially true since he specifically stated that he did not want his attorney at that time. Nevertheless, Chief Martin ceased all interrogation and only resumed an hour later when he charged the defendant with murder. Before questioning him on this charge, Chief Martin again read him his rights. The defendant stated that he understood them and wished to make a true statement. This is not an instance where the police failed to "scrupulously honor" a defendant's right to remain silent. See Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). The record clearly indicates that the defendant cooperated with the officers at all times.
Because he may have given the statements while emotional does not render them inadmissible. His comprehension was unimpaired, and he responded coherently. See State v. Weeks, La., 345 So.2d 26 (1977).
We hold that the statements were properly admitted.
These assignments of error are without merit.

ASSIGNMENT OF ERROR NO. 4
The court denied the admission of D-5, the notes of Ralph Huval, a criminologist, on his test results of the murder weapon. The defense avers that the notes were critical to his defense of accidental shooting since they would prove that the gun had a hair-trigger and would counter the report of the State's expert.
Ralph Huval, under subpoena by the State, tested the defendant's gun. However, due to his inability to testify at trial, Jim Churchman examined the gun and testified for the State. His tests revealed the following data on the weapon's trigger tension: with the hammer cocked (single action) five to six pounds of pressure were needed to fire the gun, and with the hammer at rest (double action) fourteen to seventeen pounds were needed. These results, *995 in addition to other findings, indicated that the gun did not accidentally discharge. Further, Churchman stated that when he and Huval compared their results, there were no gross discrepancies.
The defense called Kenneth Cockerham, a criminologist who worked with Huval. He identified D-5 as Huval's notes which he had not yet put in final form for the laboratory files. Cockerham read D-5 to the jury. D-5 revealed Huval's test results as follows: four to five pounds needed to fire for single action, and fourteen to fifteen pounds for double action. Immediately after this reading, the defense offered these notes as a business entry exception to the hearsay rule.
We pretermit the question of admissibility since we conclude that the defendant was not prejudiced by the court's failure to admit them. See LSA-C.Cr.P. Art. 921. The jury learned of Huval's test results when Cockerham read D-5. This reading better informed the jury of Huval's data than their reading would have because the notes contain many abbreviations which Cockerham was able to translate. Moreover, Huval's tests on trigger tension were consistent with those of Churchman, the State's expert. Thus, they did not contradict the State's evidence.
This assignment of error is without merit.
For the reasons assigned, the defendant's conviction and sentence are affirmed.
TATE, J., also assigns concurring reasons.
TATE, Justice (concurring).
The evidence as a whole shows that, although the defendant had consulted a lawyer, the law enforcement officials did not know that the lawyer was retained or that he had advised the accused to make no statement. Thus, the state did not attempt to subvert the right to counsel, in derogation of the accused's right to effective assistance of counsel. See State v. Weedon, 342 So.2d 642 (La.1977) and dissenting views in State v. Cotton, 341 So.2d 355 (La.1976).
The writer therefore concurs.

ON APPLICATION FOR REHEARING
PER CURIAM.
In his application for rehearing, the defendant points out an inadvertent erroneous statement in our majority opinion. The inadvertency occurred in the discussion of Assignment of Error No. 4. This concerned the trial court's ruling that certain test notes of a criminologist (Huval), sought to be introduced by the defendant, were inadmissible as business records.
Upon our finding that Cockerham had testified as to substance of Huval's test notes, we did not pass upon the admissibility of the evidence, since we thought the jury had already heard it. However, it is correctly pointed out that, before Cockerham testified, the jury had been retired. Therefore, the jury did not hear the testimony.
Nevertheless, the trial court correctly ruled that the test notes, containing notations as to test results, were not admissible as business records, as an exception to the hearsay rule. These notes, as to which the opposing party would have no opportunity for cross-examination, do not meet the criteria of the sort of permanent record made in the ordinary course of business by a person unavailable to testify that permits introduction of business records in limited circumstances. State v. Monroe, 345 So.2d 1185 (La.1977); Pugh, Louisiana Evidence Law 476-90 (1974).
As we stated in Monroe, 345 So.2d 1189-90, "* * * use of the business records exception against the accused in criminal prosecutions should be limited to situations in which the person making the record is genuinely unavailable for trial, either because his identity is unknown or because diligent efforts have failed to procure his attendance as a witness."[1]
*996 Here, the absent witness Huval was shown to be in Ohio on the date of the trial, having gone there a day or so before. Huval had been issued a subpoena at the instance of the state. Although the defendant's counsel knew the day before that the state was going to rely upon the testimony of another expert (Churchman), instead of Huval, due to the latter's absence, he made no attempt to secure a recess, nor any showing that he was surprised or prejudiced by the state's use of Churchman's expert testimony instead of Huval's as originally intended by the state.
As our original opinion indicates, further, Huval's test notes showed results generally consistent with the other state expert (Churchman) who did testify. Huval's notes and the other expert's testimony both indicated that the trigger-pull tension required to fire the weapon was inconsistent with the accused's defense of its accidental discharge.
REHEARING DENIED.
NOTES
[1] This is the first contested statement.
[2] This is the second contested statement.
[3] This is the third contested statement.
[1] We there stated, 345 So.2d 1189: "In criminal trials, however, the accused's constitutional rights to confront and cross-examine the witnesses against him are of paramount concern."

While here the state objected to introduction of this un-cross-examined testimony, we see no overriding reason under present circumstances why the same rule should not apply to both parties in criminal trials.