366 So.2d 1358 (1978)
STATE of Louisiana
v.
Joseph SIEGEL.
No. 62576.
Supreme Court of Louisiana.
December 15, 1978.
*1359 Alton T. Moran, Director, Allen J. Bergeron, Baton Rouge, App. Counsel, The Office of Public Defender, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara B. Rutledge, Asst. Atty. Gen., Ossie Brown, Dist. Atty., Lennie Perez, Marilyn C. Castle, Asst. Dist. Attys., for plaintiff-appellee.
DIXON, Justice.
Defendant Joseph Siegel was indicted for first degree murder in violation of R.S. 14:30, in connection with the armed robbery and murder of H. Alva Brumfield on May 25, 1973. On January 27, 1978 the jury found defendant guilty as charged and on April 28, 1978 defendant was sentenced to life imprisonment. Defendant assigned eight errors as grounds for his appeal. On appeal defendant argues only one assignment of error; therefore, the other assignments of error are considered abandoned. State v. Scwartz, 354 So.2d 1332 (La.1978).
Assignment of Error No. 8
Defendant argues that the trial court erred in admitting incriminating statements obtained through interrogation in violation of defendant's right to counsel.
After defendant had been arrested and had been in jail several months, he was interviewed by an assistant attorney general, Mr. Hymel, accompanied by another prosecutor, Mr. Ruggiero, who were prosecuting, not defendant, but Willie Beard for armed robbery of H. Alva Brumfield on May 25, 1973; Brumfield was murdered during the robbery, and defendant was indicted for murder. Defendant gave a statement concerning the Beard case which was self-incriminating.
In a hearing outside the jury's presence, the prosecutors both testified that defendant was read, before the interview, his Miranda rights, including his right to an attorney and his privilege against self-incrimination. Both testified that defendant told them he had an attorney, but when asked whether defendant wished to contact his counsel and have him present during the interview, defendant declined. Mr. Ruggiero also testified that defendant was twenty feet from a telephone that he could have used.
At the same hearing defendant testified that the two prosecutors did not read his rights to him, but simply asked him if he understood his rights. On cross-examination he stated that he understood his right to remain silent and right to counsel, but that he was not fully aware that his attorney should be present at an interrogation, not about murder of Brumfield, but about a "completely different crime that was associated with the Brumfield case."[1] Further, *1360 during cross-examination, defendant stated that he had become involved with the legal aspects of his case and his friends' cases and had become a jailhouse lawyer by the time that the interview in question was conducted. The trial court ruled that a sufficient predicate had been laid and that the statement could be introduced into evidence.
Before an inculpatory statement can be introduced in evidence, the state has the burden of affirmatively proving that it was free and voluntary. R.S. 15:451; C.Cr.P. 703(C). The state must also establish that an accused who makes an inculpatory statement during custodial interrogation is first advised of his Miranda rights. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). A confession need not be the spontaneous act of the accused and may be obtained by means of questions and answers. State v. Thomason, 353 So.2d 235, 239 (La.1977). The admissibility of an inculpatory statement is in the first instance a question for the trial judge. His conclusions on the credibility and weight of the testimony relating to the voluntariness of the inculpatory statement will not be overturned unless they are not supported by the evidence. State v. Thomason, supra.
In the present case defense contends that the fact that the interrogating officers were aware that defendant had retained counsel increased the magnitude of the violation of defendant's rights. In ruling on the admissibility of defendant's inculpatory statement the trial judge relied on State v. Cotton, 341 So.2d 355, 359 (La.1977),[2] where this court stated:
"This record undoubtedly supports the finding of the trial judge that Cotton's statement to Robinson was free and voluntary. We do not believe that the fact that a defendant has an attorney means that law enforcement officials cannot procure a statement of any kind from him without prior notice to, if not the consent of, the attorney. United States v. Cobbs, 481 F.2d 196 (3rd Cir. 1973), cert, denied, 414 U.S. 980, 94 S.Ct. 298, 38 L.Ed.2d 224 (1973); United States v. Springer, 460 F.2d 1344, (7th Cir. 1972), cert, denied, 409 U.S. 873, 93 S.Ct. 205, 34 L.Ed.2d 125 (1972). The court in Springer, id., held that a constitutional right such as the right to counsel may be waived, although there is a higher standard imposed to show waiver of the presence of counsel once counsel had been appointed than before.
In Coughlan v. United States, 391 F.2d 371 (9th Cir. 1968), cert, denied, 393 U.S. 870, 89 S.Ct. 159, 21 L.Ed.2d 139 (1968), oral statements were testified to in court by police officers who interviewed the defendant in a jail interview room. The officers knew that the defendant was represented by counsel, but counsel knew nothing of the interview. As is true here, the defendant in Coughlan was fully warned, before he made any statements, of his Miranda rights; but he waived those rights. The court held that the statements made by the defendant were admissible in evidence although it further indicated disapproval, as we do here, of the practice of interviewing prisoners in the absence of their attorneys. This holding was approved in United States v. Cobbs, supra.
In United States v. Cobbs, supra, the court stated that it is permissible for a law enforcement official to interview a defendant, even though the defendant has counsel and even though that counsel *1361 is not consulted, as long as the proper Miranda warnings are given. The same applies to the case before us. See also Moore v. Wolff, 495 F.2d 35 (8th Cir. 1973). . . ."
In the present case the record indicates that defendant often disregarded his attorney's admonitions. For example, defendant, against the advice of his attorney, granted a television taped interview with a newsman and discussed his case during the interview, giving much the same information that he gave the two prosecutors.
Defense further relies on State in the Interest of Dino, 359 So.2d 586 (La.1978), where this court found that it is well settled under Miranda and our state constitution that if a statement is taken without the presence of an attorney, under circumstances in which the warnings are required, a heavy burden rests on the state to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. Defendant urges that the reasoning of Miranda does not permit a finding of knowing and intelligent waiver upon the bare allegation that the interrogating officers recited the Miranda rights to the accused.
The record in the present case, however, indicates that (1) defendant received his Miranda rights and understood them, and (2) defendant knowingly and intelligently waived his rights. First, both interrogators testified that they told defendant his Miranda rights. Defendant testified at the same hearing that he had been advised of his Miranda rights on two prior occasions since Miranda was decided. He also testified that he realized how extensive the defendant's rights are under the Miranda decision when he received some law books, including Jailhouse Lawyer's Manual, in July, 1974. (Defendant was interviewed on November 19, 1975). Defendant's testimony indicates that he understood his Miranda rights.[3]
Second, the record indicates that at the time of the interview defendant was knowledgeable in criminal law, had openly discussed his case with numerous persons other than his attorney, and was not new to the criminal justice system (defendant had spent twenty-six of his forty-nine years behind bars in various institutions for numerous offenses). Defendant acted as his own attorney on numerous occasions even though he had counsel; he estimated that since receiving his law books he had filed three hundred to four hundred writs for himself and other inmates, of which a number were filed before the interview in question. Also before the interview, defendant had filed numerous lawsuits for himself and the other defendants in the Brumfield case. Prior to the interview in question, defendant had testified about the Brumfield case in open court,[4] had written letters detailing *1362 his position to newspapers, talked to news reporters, spoken informally to the assistant district attorney,[5] and signed a twenty-six page detailed statement of his position which was almost identical to the information defendant gave the interrogators. The cumulative effect of the above indicates that the defendant knowingly and intelligently waived his right to counsel and right to remain silent.
For the reasons assigned, the conviction and sentence of defendant are affirmed.
NOTES
[1] The following exchange occurred between the assistant district attorney and defendant:

"Q Were you aware at the time that Mr. Ruggiero and Mr. Hymel came into the room, that as a person accused of a crime, you had the right to remain silent under the Fifth Amendment of the Constitution?
A Yes.
Q Were you aware that you had a right to counsel?
A Yes.
Q Were you aware that you had a right not to say anything to any person other than your attorney without your attorney present?
A Well, I wasn't fully aware of this. You
Q You were not fully aware of it?
A Not fully aware that my attorney should be present. And, in this respect that if I was being questioned for a crime that I committed I'd have to have my attorney present.
Q You felt at that time you had not committed a crime so you didn't have to have an attorney present?
A I felt at that time I did not commit the crime of murder.
Q You felt you had no reason not to talk to them without your attorney present? You felt the only reason you needed an attorney present was if you were guilty?
A No, not that. If I was being questioned for the murder of H. Alva Brumfield, I'd have to have my attorney present, but my understanding was they were talking to me about a completely different crime that was associated with the Brumfield case.
Q What did they tell you they were talking to you about?
A Aggravated burglary.
Q Did they tell youwere you aware that they were questioning you about the incident on May 25, 1973 wherein Mr. Brumfield was killed during the burglary?
A Yes.
Q You were aware of that?
A Yes.
Q You were aware at that time that you were under indictment for several charges in connection with that same incident?
A Yes, but not aggravated burglary or conspiracy to the same."
[2] In State v. Cotton, supra, the defendant, who was advised by his attorney not to make any statements, requested to speak to a police officer on three occasions before the officer who knew of the attorney's advice met with the defendant. This court found the subsequent confession was not involuntary, even though the officer mistakenly informed the defendant that two persons had identified him at the line-up when in fact no one had identified the defendant.
[3] The following exchange occurred between the assistant district attorney and defendant:

"Q Mr. Siegel, you were quite aware, were you not, during that period of time, that you had a right to remain silent and you did not have to talk to people under your constitutional rights, is that no
A Yes, I'm aware of that.
Q You wereand you were aware that you had an attorney and you had a right to have him present, were you not?
A If we were talking about the murder of H. Alva Brumfield.
Q Were you aware that you had the right to say, look, I don't want to talk to you about the time of day, I don't want to talk to you about anything? Did anybody try to make you talk?
A No.
Q You were aware that you didn't have to talk to anybody about anything, is that correct?
A That's correct.
Q You freely chose to talk to them?
A Yes."
[4] The following exchange occurred between the assistant district attorney and defendant:

"Q You had testified in court previous to that time about that same incident?
A I testified in court previous to that time about an armed robbery?
Q The armed robbery of Mr. Brumfield on that same night?
A Yes.
Q As part of the same burglary or conspiracy in the same chain of events?
A As part of the murder of H. Alva Brumfield, part of the conspiracy to murder H. Alva Brumfield, armed robbery of Brumfield and conspiracy to rob Brumfield.
Q You had previously testified in open court about that matter?
A Only about the armed robbery of Mr. Brumfield.
Q Did you testify you were in fact present when Mr. Brumfield was murdered?
A I didn't understand you.
Q Did you testify in open court that Mr. Brumfield was murderedthat you were present?
A That I was present at his murder?
Q Yes sir.
A I perjured myself.
Q I mean, did you testify about that when you were in open court?
A I perjured myself in that regard.
Q Were you made aware when you had come to court by Judge Covington that you had a right to counsel, that you had a right not to make any statements and talk to anyone?
A That's right."
[5] Assistant district attorney:

"Q How many people have you talked to about this incident sincewhether it be around courtrooms or jails or whateverhow many people have you talked to on a formal or informal basis about theseabout these proceedings?
MR. REINE (defense counsel): Objection, Your Honor, I think it's irrelevant.
THE COURT: I think it's relevant. It goes to whether or not it was a knowing and intelligent waiver in view of what he said about not understanding he was talking to them about
.....
Q You talked about it with newspaper reporters, several, haven't you?
A (defendant) I've only talked to one newspaper reporter and that was Mike Jones.
Q Have you ever talked to Gibbs Adams, informally?
A Informally, yes.
Q About facets of the case?
A Yes.
Q You realize that those statements that you made could have been used against you?
A I was very careful.
Q You realize that Michael Jonesthe statements you made to Michael Jones could be used against you?
A Oh yes, I realize that.
Q Isn't it true that you freely talked to any number of people about that, including probably talking to me at several times out at the Parish Prison on an informal basis about it?
A I talked to you once out in the Parish Prison. It was about May of 1974.
Q Okay, true, isn't it that you have had no hesitancy at all about talking about the matter to almost anybody who would lend an ear?
A Well, let's put it that way. Probably five hundred men have come into my dormitory and left and there isn't a day that none of us will rap about our case.
Q And you have written numerous letters about this incident, detailing your position, to the newspapers, is that correct?
A Yes.
Q Openly writing letters with information specifically about yourthe factual details of the Brumfield case as you know them?
A Yes."